IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,

                Plaintiff

v.

JAKE BARTTELT and
DANIEL L. BOHMAN,

                Defendants.

REPORT AND
RECOMMENDATION

10-cr-38-wmc

_____

## REPORT

The grand jury has charged defendants Jake Barttelt, Daniel L. Bohman and Shawn Ably with various crimes related to methamphetamine cooking. Counts 4 and 5 against Barttelt and Bohman are based on evidence derived by law enforcement agents from a late night traffic stop on August 18, 2009 in rural Lincoln County. Barttelt and Bohman each has filed his own motion to quash the stop and to suppress all evidence derived from it. *See* dkts. 33 and 43). For the reasons stated below, I am recommending that the court deny these motions.

On May 13, 2010, this court held an evidentiary hearing on these motions. Having heard and seen the witness testify, having reviewed the exhibits, and having made credibility determinations, I find the following facts:

### Facts

Brian Kingsley has been employed by the Lincoln County Sheriff's Department in Merrill, Wisconsin for over seventeen years, the first ten as a patrol officer, since then as a sergeant investigator. Sergeant Kingsley has received special training in drug investigation, including investigating methamphetamine laboratories (meth labs) and has investigated about 40 meth labs. Sergeant Kingsley knows that a meth lab can be small enough to fit in a

cardboard box and can be very easy to transport. One result of Sergeant Kingsley's training and experience is that he is familiar with the odor of anhydrous ammonia, a chemical commonly used to cook methamphetamine. Sergeant Kingsley can discern anhydrous ammonia because it is noticeably more pungent than household ammonia, to the point that it burns his nose and mouth to smell it. While working drug cases in Lincoln County in 2009, Sergeant Kingsley was aware that local law enforcement agents suspected area resident Jake Bartlett of being a methamphetamine cooker. Sgt. Kingsley had never met Bartlett and did not know what he looked like. Sergeant Kingsley also had had professional contact with area resident Dan Bohman, and knew that Bohman had been arrested in 2005 while present at a methamphetamine cook taking place on his brother's property.

  On August 18, 2009, Lieutenant Gary Schneck of the Marathon County Special Investigations Unit asked Sgt. Kingsley to visit the Marathon County Sheriff's Department to talk to an informant who had information about drug activity in Lincoln County. Sgt. Kingsley had worked with Lt. Schneck before and had found him useful and reliable, so he made the trip, arriving at about 8:20 p.m..

  The informant's name was Ed Olmsted. Sgt. Kingsley had never worked with Olmsted before, but Lt. Schneck vouched for him by stating generally that he had obtained information from Olmsted on previous occasions. Olmsted was under arrest and charged with unlawful possession of drug paraphernalia including an anhydrous tank; he was looking snitch in exchange for consideration on his charges.

  Olmsted admitted to Sgt. Kingsley that he was involved in methamphetamine cooking and claimed that three times in the past two month he had been present when Jake Bartlett was

cooking meth at a hunting cabin on "Big Tony's" property off of Hagar City Road in Lincoln County.  Olmsted had seen the tank of anhydrous ammonia at the cabin within the last week or so. Sgt. Kingsley placed a plat book in front of Olmsted, who pointed to a 40 acre parcel at the corner of Hagar City Road and Savaske Road, owned by Tony Thorenson. Olmsted reported that a locked cable blocked the drive leading to the cabin from Savaske Road.  Olmsted told the investigators that Barttelt was driving a green Grand Marquis that he had obtained from a man named Chuck Groff.

In Sgt. Kingsley's experience, methamphetamine cookers did not store anhydrous ammonia for long periods of time (that is, more than a week) without using it to cook methamphetamine.  Therefore, based on Olmsted's report, Sgt. Kingsley believed that one of three stages of a methamphetamine cook would be found at Thorenson's cabin: (1)  The pre-cooking phase, during which ingredients and paraphernalia were gathered; (2) an active cooking operation; or (3) the post-cooking phase, which would yield evidence in the form of discarded glassware and coffee filters, empty starter fluid cans, lithium battery strips, *etc*.

Sgt. Kingsley shared Olmsted's information with his lieutenant, who directed Kingsley to drive to Thorenson's property with Lincoln County Sheriff's Investigator Andy VanderWyst to begin immediate surveillance.  The investigators arrived in an unmarked squad car at about 10:45 p.m. that evening.  They saw a cable blocking the drive leading to a hunting cabin about 300 yards away.  A light was lit in or near the cabin, so the investigators decided to focus their surveillance on it.  As they were prepping their surveillance gear, Sgt. Kingsley inadvertently beeped his car horn.

Within 20 seconds, car lights came on up near the cabin. Surprised, Sgt. Kingsley backed his car away from the cabled drive, leaving his own car lights unlit. The car from the property pulled up to the cable, stopped, waited for 20 - 30 seconds, then backed up whence it had come. Sgt. Kingsley repositioned his car to the other side of the cabled drive. Within about four or five minutes, a car drove from the cabin area to the cable and stopped, apparently to unlock the cable. The car then pulled out Eastbound, toward where Sgt. Kingsley happened to be parked. As the car approached, Sgt. Kingsley activated the blue and red emergency lights on his car and drove toward it, causing it to stop. The car was a reddish/maroon Beretta.

Sgt. Kingsley stopped about ten feet in front of the other car and left his headlights on. He and Investigator VanderWyst got out and walked toward the other car. Sgt. Kingsley recognized the driver as Dan Bohman, with whom he had had professional contact on numerous occasions, but he did not recognize the passenger. The investigators, who were in plain clothes and not brandishing firearms, identified themselves and directed both men to step out of the car. The passenger, who was wearing shorts, no shirt and tennis shoes, identified himself as Jake Barttelt. As he led Barttelt to the front of the car to question him alone, Sgt. Kingsley smelled anhydrous ammonia. When asked what he was doing in the woods that night, Barttelt told Sgt. Kingsley that he had been bear hunting. Although this was possible, Sgt. Kingsley deemed this unbelievable given the time of night and Barttelt's clothing. Up to this point, neither investigator had told either occupant of the car that he was a suspect in a drug investigation.

Sgt. Kingsley concluded that they had uncovered an active methamphetamine cooking operation, so he and Inv. VanderWyst handcuffed Barttelt and Bohman and placed them in the back of the squad car. Bohman admitted that they were cooking meth up in the cabin. By then,

backup had arrived, so they went up to the cabin, saw other indicia of meth cooking, rounded up four more suspects and secured the premises. The investigators then obtained a state search warrant for the cabin, which resulted in the recovery of the evidence that Barttelt and Bohman now move to suppress. Several days later, property owner Tony Thorenson told Sgt. Kingsley that no one was supposed to be at the cabin unless he was there too.

## ANALYSIS

"Suppression of evidence . . . has always been our lasts resort, not our first impulse."

*Hudson v. Michigan,* 547 U.S. 586, 591 (2006).

Bartlett and Bohman separately raise the same ground for suppression of evidence seized during execution of the search warrant at Big Tony's cabin: the exclusionary rule requires suppression because the evidence derives from a constitutionally unreasonable traffic stop as they drove from the cabin on August 18, 2009. The government responds with many arguments, including defendants' lack of a privacy interest in the cabin and attenuation/inevitable discovery, but there is no need to go beyond the reasonable suspicion analysis, prefaced by an overview of the recent retrenchment of the exclusionary rule, which now is reserved for cases of deliberate, reckless or grossly negligent conduct by law enforcement officers. *See Herring v. United States*, ___ U.S. ___, 126 S.Ct. 695, 702 (2009); *Herring v. United States* and *Hudson v. Michigan*, 547 U.S. 586 (2006). Here's the new rule:

> To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the judicial system. As laid out in our cases, the exclusionary rule serves to

>   deter deliberate, reckless, or grossly negligent conduct, or in some
>   circumstances recurring or systemic negligence.

*Herring*, 129 S.Ct. at 702.

As is clear from the facts above–or at least, clear to the court and set forth here as the court's conclusion– Sgt. Kingsley and Investigator VanderWyst did not engage in deliberate, reckless or grossly negligent conduct when they stopped the car and questioned its occupants.

No clear picture has emerged yet from the Seventh Circuit on how it gauges the impact of *Herring* and *Hudson*. In *United States v. Crowder*, 588 F.3d 929 , 934 (7th Cir. 2009), decided on the defendant's lack of an expectation of privacy, the court observed in *dicta* that courts usually exclude evidence obtained in violation of the Fourth Amended, then tempered this observation with a "*but see*" citation to *Herring*, 129 S.Ct. at 700. In *United States v. Burnside*, 588 F.3d 511, 517 (7th Cir. 2009), the court, by the same authoring judge (Kanne, J.), made pretty much the same observation with the same "*but see*" citation to *Herring* and *Guzman v. City of Chicago*, 565 F.3d 393, 398 (7th Cir. 2009).

*Guzman* was § 1983 civil rights lawsuit opinion authored by Judge Evans (who sat with Judge Kanne on *Crowder*) in which the plaintiff sued for a violation of her Fourth Amendment rights when Chicago police officers searched her apartment in a multi-unit building based on a search warrant affidavit that had incorrectly reported the building to be a single-family dwelling. The court found a constitutional violation based on the officers' reckless execution of the warrant after learning facts that should have alerted them that their warrant was wrong. The majority then offered in dicta its view that *Guzman* "may illustrate our recent observation that in some ways it is easier to protect Fourth Amendment rights through civil actions, rather than through the suppression of evidence in criminal cases." 565 F.3d at 398, citing *United States v.*

*Sims*, 553 F.3d 580 585 (7th Cir. 2009).[1]  Citing *Herring* and *Hudson*, the court noted that suppression is a last resort, that exclusion is not a necessary consequence of a Fourth Amendment violation, and the benefits of exclusion must outweigh the costs, costs that are not a concern in civil cases.  As an example, the court noted that civil rights lawsuits did not raise concerns that illegally seized evidence essential to convicting a defendants of a grave crime might have to be suppressed and  the criminal let go to continue his career of criminality, even if the harm inflicted by the illegal search to the interests protected by the Fourth Amendment was slight in comparison to the harm to society of letting the defendant off scot free.  *Id.* at 399.  Judge Rover offered a concurrence joining the result but scolding the majority for its gratuitous musings on the continued vitality of the exclusionary rule.  *Id.* (Rovner, J., concurring).

Judge Rovner was on the panel in *United States v. Elst*, 579 F.3d 740 (7th Cir. 2009) (Judge Tinder wrote the opinion), in which the court declined to suppress evidence obtained by the officers in the good faith execution of a search warrant that lacked probable cause.  The court cited *Herring* for the proposition that exclusion of evidence is an extreme sanction that applies only where it would result in appreciable deterrence. The court found that "it would not here." *Id.* at 747.

This review of circuit cases does not provide much useful guidance beyond the Supreme Court's own observations and admonitions in *Herring* and *Hudson:* a court should not suppress evidence in a criminal case unless it finds a need to deter police conduct that violated a suspect's rights in a manner that exceeds mere negligence.  The investigators' conduct in this case does not

---

[1] In *Sims*, Judge Posner predicts the forthcoming demise of the exclusionary rule in favor of civil rights lawsuits.  553 .F.3d at 583-84; *see also Samuel v. Frank*, 525 F.3d 566, 570 (7th Cir. 2008), in a state habeas case, Judge Posner's opinion observes that "exclusionary rules have fallen out of favor."

meet this standard. I conclude first that they had reasonable suspicion to stop defendants' car to ask some question, and second, that if the first conclusion is wrong, then the officers' conduct is so close to being acceptable and the actual intrusion on defendants' rights so minimal that suppression would be too extreme a sanction under the circumstances.

Let's start with a definition of reasonable suspicion sufficient to justify a *Terry* stop:

> In order to conduct an investigatory stop, also known as a "*Terry* stop," . . . and officer must be aware of specific and articulable facts giving rise to reasonable suspicion. A reasonable suspicion requires more than a hunch but less than probable cause and considerably less than preponderance of the evidence. Police officers are permitted to rely on their experience and training in forming a reasonable suspicion. Determining whether an officer had a reasonable suspicion is assessed considering the totality of the circumstances and commonsensical judgments and inferences about human behavior.

*United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010); *see also United States v. Hampton*, 585 F.3d 1033, 1038 (7th Cir. 2009)(investigatory stop allowed if police can point to specific and articulable facts that suggest criminality rather than a hunch); *United States v. Fiasche*, 520 F.3d 694, 697 (7th Cir. 2008)("'reasonable suspicion,' of course, lies in an area between probable cause and a mere hunch."); *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006)(reasonable suspicion requires at least a minimal level of objective justification for making the stop). An investigative stop need only be reasonably related in scope to the circumstances that justified the interference in the first place, *see Jewett v. Anders*, 521 F.3d 818, 824 (7th Cir. 2008), here, a low-key traffic stop with a 2/2 officer-to-suspect ratio and no drawn weapons.

When a single informant provides the tip that leads to a *Terry* stop, the adequacy of the tip depends on the amount of information given, the degree of reliability and the extent that the

officers can corroborate some of the informant's information. *United States v. Booker*, 579 F.3d 835, 838 (7th Cir. 2009). This sounds a lot like how courts test an informant's reliability when reviewing a challenged search warrant, but reasonable suspicion may arise from information that is less reliable than that required to show probable cause. *Fiasche*, 520 F.3d at 698, quoting *Alabama v. White*, 496 U.S. 325, 330 (1990). *See also United States v. Watson*, 558 F.3d 702, 703-04 (7th Cir. 2009)(one quasi-anonymous tipster's detailed report of first-hand observations provided reasonable suspicion to stop defendant's car).

Here, Marathon County's informant, Olmsted, was a known quantity, having been caught in the meth business before and again on August 18, 2009. Lt. Schneck deemed Olmsted sufficiently reliable from past tips that he suggested Sgt. Kingsley drive over from Lincoln County that night to his Olmsted's report, then he vouched for Olmsted's reliability. It was only "headline" variety vouching, but in a reasonable suspicion analysis that's not nothing: it was clear from the context of the meeting that Lt. Schneck was satisfied in a professional capacity with information Olmsted had provided before. Olmsted, as a previous player in the arrestee/snitch game, would be aware of the common sense notion that there are incentives to provide your captors with useful information and disincentives to being caught in a lie. *Cf. Watson*, 558 F.3d at 703 (a tip is less likely to be malicious or irresponsible if tipster knows that the police can find him). Olmsted gave a relatively detailed, self-inculpatory account of having been present three times at Big Tony's place when Barttelt–a suspected meth cooker–was in fact cooking meth, and Olmsted was able to pinpoint the location on a plat map. Sgt. Kingsley was able to verify that "Tony" Thorenson owned the property and later confirmed that there was a cable blocking the drive.

The allegation that most intrigued the investigators was Olmsted's report that he had seen a tank of anhydrous ammonia on the premises within the past week or so. Both defendants attempt to marginalize this report by correctly observing how portable and ethereal meth labs and ammonia tanks could be. But we're talking reasonable suspicion here, not probable cause. The report of three cooks in two months at the same location suggested that Barttelt had settled in at Big Tony's and was not going anywhere. Sgt. Kingsley, a veteran meth lab investigator, was aware that the ammonia seen by Olmsted might already be gone, but it also might still be at the cabin and in use. This suspicion that the tank might still be at Big Tony's could be "considerably less" than a 50/50 chance and *still* be a useable factor in Sgt. Kingsley's consideration of the totality of circumstances.

This is where the intangibles come into play. Clearly this court can and must take into account an experienced drug investigator's opinion of what all this meant. If someone with Sgt. Kingsley's training and experience opines that Olmsted's report led him to suspect that Barttelt then and there could be cooking methamphetamine, so long as Sgt. Kingsley can point to definite and articulable facts supporting this suspicion, it's probably reasonable. Howsoever irritating this process may be to defendants and their attorneys–who have no good way to impeach what they view as self-serving and subjective conclusions by law enforcement agents–it is not improper bootstrapping. There's merit in giving credence to specialists who have been there and done that many, many times before. Common sense suggests that Sgt. Kingsley would not have wasted his time on a late-night, middle-of-nowhere surveillance if he had thought that Olmsted was blowing smoke.

10

What's left is determining the reasonableness of Sgt. Kingsley suspicion that the car he stopped was associated with the suspected meth lab up at Big Tony's. I agree with the defendants that there was nothing independently suspicious about a car driving down from the cabin to the locked cable after hearing a car horn; anyone up at the cabin would have done the same thing regardless what they were doing. Next, there was nothing independently suspicious about the fact that a car was leaving the cabin at about 11:00 p.m., and the lack of other traffic in the area meant nothing in sparsely-populated, densely-forested Lincoln County. At first blush, it would seem that the operative question is whether it was sufficiently reasonable for Sgt. Kingsley to suspect that anyone present at the cabin that night was involved in or knew about a meth lab so as to justify stopping each departing vehicle to question its occupants. The government argues that it was, citing *United States v. Brignoni-Ponce*, 422 U.S. 873 (1975), *Jewett v. Anders*, 521 F.3d 818 (7th Cir. 2008), and *United States v. Clements*, 522 F.3d 790 (7th Cir. 2008). Each of these case cases is either factually or legally distinguishable from the instant case, but this doesn't mean that Sgt. Kingsley lacked reasonable suspicion to stop the car and question the occupants.

Perhaps a better analytical approach to this fact situation would be to analogize this night-time, northwoods encounter between the defendants and the investigators to the airport/train station encounter scenario explained by the court in *Tyler*, 512 F.3d at 410. In these cases, narcotics officers stopped travels at airports or train station "on some but generally insufficient suspicion to just a *Terry* stop." The court deemed the initial encounter as consensual questioning and moved to the question whether this encounter ripened into an investigative detention requiring reasonable suspicion. If the police told the suspects that they were under

investigation for drug crimes or held onto their documentation, then the encounter became an investigation detention; if they did not do these things, then the encounter remained analytically "consensual." *Id.*

Here, I have already found that Sgt. Kingsley had a reasonable suspicion that Barttelt was running a meth lab at Big Tony's cabin and that evidence would be found there that evening. I am not convinced that it would be reasonable to suspect that every person driving from the cabin was *engaged* in the suspected criminal activity, but it was reasonable to suspect that they had seen it or were aware of it. This probably would justify a *Terry* stop of the maroon Beretta that evening. Alternatively, if the train station analogy holds, then Sgt. Kingsley still had reasonable suspicion to believe that Barttelt was running a meth lab at the cabin, which provided him with "some" suspicion briefly and gently to stop and question people leaving the premises.

Which is exactly what Sgt. Kingsley did. The defendants try to juice up the intrusiveness of the initial encounter, but the evidence does not support their spin. The stop was initiated by the investigators activating their emergency lights while facing Barttelt's car, then approaching to within ten feet of it and stopping. The two plainclothes investigators stepped out of their car, did not draw weapons, identified themselves, asked the defendants to step out of their car, then asked them who they were and what they were doing. They did not tell the defendants that they were suspects in a drug investigation. All of this comports with the requirements set forth in *Tyler* to label this a consensual stop, at least at first.

Everything changed when Sgt. Kingsley smelled anhydrous ammonia while walking Barttelt to the front of the car. He knew what it was and he knew what Barttelt had been doing. In that instant, enough pieces of the puzzle fell into place to provide probable cause to arrest

both Barttelt and Bohman for manufacturing methamphetamine. Whether Sgt. Kingsley thereafter deemed his suspects to be under arrest is irrelevant.

Circling back to *Herring* and *Hudson*, even if the investigators should not have stopped the maroon Beretta to question its occupants, this was a close call, too close for this court to deem the investigators' conduct intentionally or recklessly violative of the Fourth Amendment. The investigators were not randomly stopping cars on unsupported hunches, they were methodically pursuing legitimate investigative leads supported by legally reasonable suspicions. If they erred–and my primary conclusion is that they did not–then they erred negligently in a good faith attempt to pursue their investigation in a lawful manner.

In *United States v. Groves*, 559 F.3d 637, 642 (7th Cir. 2009), the court offered in dicta its view that even if the challenged car stop had not been supported by reasonable suspicion, suppression of the contraband was not required because there was nothing in the record to suggest that the police had recklessly disregarded constitutional requirements or had knowingly falsified an arrest record to justify the stop. So it is here: regardless of the analytical route taken, we arrive at the same location. Exclusion of the challenged evidence is not justified.

RECOMMENDATION

Pursuant to 42 U.S.C. § 636(b)(1)(B) and for the reasons stated above, I recommend that this court deny the two pending motions to suppress evidence, dkts. 33 and 43.

Entered this 12th day of July, 2010.

BY THE COURT:

/s/

_____
STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
120 N. Henry Street, Rm. 540
Post Office Box 591
Madison, Wisconsin 53701

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153

July 12, 2010

Robert Anderson
United States Attorney's Office
660 West Washington Avenue, #303
Madison, WI 53703

William Jones
Jones Law Firm
P.O. Box 44188
Madison, WI 53744

Anthony C. Delyea
Delyea Law Office
1027 East Johnson Street
Madison, WI 53703

   Re: United States v. Barttelt; United States v. Bohman
     Case No. 10-cr-38-wmc

Dear Counsel:

  The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

  The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

  In accordance with the provisions set forth in the newly-updated memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before July 22, 2010, by filing a memorandum with the court with a copy to opposing counsel.

15

If no memorandum is received by July 22, 2010, the court will proceed to consider the magistrate judge's Report and Recommendation.

                                      Sincerely,

                                      /s/ S. Vogel for
                                      Connie A. Korth
                                      Secretary to Magistrate Judge Crocker

Enclosures
cc:     Honorable William M. Conley, District Judge

16