IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

Plaintiff,

ORDER

v.

10-cr-38-wmc[1]

JAKE BARTTELT and
DANIEL L. BOHMAN,

Defendants.

---

Defendants Jake Barttelt and Daniel L. Bohman were charged in a multiple count indictment of various crimes arising out of the manufacture of methamphetamine. Count 5 of the indictment is based on evidence obtained by law enforcement agents after a night traffic stop on August 18, 2009, in rural Lincoln County. Both defendants moved to suppress the evidence obtained as a result of the stop.[2]

On May 13, 2010, United States Magistrate Judge Stephen Crocker held an evidentiary hearing on these motions. In a report and recommendation entered on July 12, 2010, Magistrate Judge Crocker provided a detailed summary of the facts and recommended this court deny the motions, finding that the law enforcement officers had reasonable suspicion for the stop based on information provided by a confidential informant or,

---

[1] This case was reassigned to Judge William Conley pursuant to a March 31, 2010 administrative order.

[2] Both defendants pled guilty to Count 5 conditioned on the government dismissing all other counts and preserving their right to appeal from any denial of their suppression motion.

alternatively, that it was a consensual stop. The magistrate judge also found that even if the officers should not have stopped the car, exclusion of evidence derived from the stop is unwarranted because any error was the product of negligence, not of deliberate indifference to defendants' rights.

Bohman objects to Magistrate Judge Crocker's factual findings concerning the stop and the reliability of the informant, as well as to his legal conclusion that there was a consensual encounter. Barttelt does not object to the magistrate judge's factual findings concerning the traffic stop, but objects to his findings concerning the reliability of the informant. Barttelt also objects to the magistrate judges' reliance on intangible factors, as well as his legal conclusions that (1) there was reasonable suspicion to stop the car, (2) the search was consensual and (3) the evidence should not be suppressed.

Pursuant to 28 U.S.C. § 636(b)(1)(C), the court reviews the magistrate judge's report and recommendation de novo as to those portions to which objection is made. Because the officers had a good faith belief that they had a reasonable suspicion to stop the car, the court will adopt Magistrate Judge Crocker's Report and Recommendation, except as specifically noted below, and on that basis deny defendants' motions to suppress.

## FACTS

The Report and Recommendation contains a detailed summary of the facts relevant to defendants' motions. The following facts provide a brief overview, noting those limited findings disputed by defendants.

On August 18, 2009, Lieutenant Gary Schneck of the Marathon County Special Investigations Unit asked Sergeant Brian Kingsley, a Lincoln County Sheriff's investigator, to visit the Marathon County Sheriff's Department to talk to an informant, Ed Olmsted, who claimed to have information about drug activity in Lincoln County. Schneck, in somewhat terse fashion, told Kingsley that he had received information from Olmsted in the past.[3] (Mot. Hr'g Tr., dkt. #51, at 53:7-14.) Kingsley, having worked with and relied on Schneck before, credited his endorsement of Olmsted.

Kingsley talked to Olmsted, who was under arrest and charged with unlawful possession of drug paraphernalia, including an anhydrous tank. Olmsted told Kingsley that he was involved in methamphetamine cooking and that three times in the past two months he had been present when Jake Barttelt was cooking meth at a hunting cabin on "Big Tony's" property off Hagar City Road in Lincoln County. Olmsted showed Kingsley where the property was by pointing in a plat book to property owned by Tony Thorenson. Olmsted also reported that (1) he had seen a tank of anhydrous ammonia at the cabin within the last week or so, (2) there was a locked cable blocking the drive leading to the cabin from Savaske Road, and (3) Barttelt was driving a green Grand Marquis. Based on his experience, Kingsley concluded that evidence of methamphetamine manufacturing would be found at

[3] Defendant Barttelt objects to the fact in the Report and Recommendation that Schneck told Kingsley that he had received information from Olmsted on more than one previous occasion. (Def.'s Br., dkt. #69, at 1.) The record does not list the number of times Schneck had previously received information from Olmsted, but merely states that Schneck "had information from Ed in the past" (Mot. Hr'g Tr., dkt. #51, at 53:12-13). This vague statement could refer to either one previous occasion or more than one occasion. Either way, for purposes of deciding defendants' motions, the court assumes that there was only one previous occasion.

the cabin.

Kingsley and Lincoln County Sheriff's Investigator Andy VanderWyst drove to Thorenson's property to begin immediate surveillance. They saw a cable blocking the drive leading to a hunting cabin about 300 yards away. At some point, Kingsley inadvertently beeped his car horn. Within 20 seconds, car lights came on up near the cabin. A car from the property pulled up to the cable and then backed up. Within about four or five minutes, a car drove from the cabin area to the cable, stopped and someone got out to remove the cable. The car, a reddish or maroon Berretta, then pulled out Eastbound in the direction of where Kinglsey happened to be parked.

As the car approached, Kingsley activated the blue and red emergency lights on his car and drove toward the Berretta causing it to stop. Kingsley stopped about ten feet in front of the Berretta leaving his headlights on. Kingsley recognized the driver as Dan Bohman, with whom he had had professional contact on numerous occasions, but he did not recognize the passenger.

Kingsley and VanderWyst, who were in plain clothes and not brandishing firearms, identified themselves and directed both men to step out of the car. The passenger, who was wearing shorts, no shirt and tennis shoes, identified himself as Jake Barttelt. After briefly questioning them, Kingsley smelled anhydrous ammonia. When asked what he was doing in the woods that night Barttelt told Kingsley he had been bear hunting. Kingsley deemed this unbelievable given Barttelt's clothing and the time of night.

Up to this point, neither investigator had told either occupant of the car that he was

a suspect in a drug investigation. After Kingsley concluded, based on the smell and Barttelt's answers to questions, that they had uncovered an active methamphetamine cooking operation, Bohman and Barttelt were taken into custody. (*Id.*, dkt. #51, at 41:11-42:15.)

OPINION

Both Barttelt and Bohman object to the magistrate judge's finding that the challenged evidence should not be excluded. The magistrate judge concluded that (1) the officers either conducted a permissible, consensual police-citizen questioning of defendants or a proper investigatory stop of the car to ask questions; and (2) even if these determinations were wrong, the officers' conduct was sufficiently justified and the actual intrusion on the defendants' right so minimal that suppression would be too extreme a sanction under the circumstances. This court agrees with that ultimate conclusion.

The Fourth Amendment protects citizens from "unreasonable searches and seizures." Further, the purpose of the Fourth Amendment is "to strike a balance between the interest of the individual in being left alone by the police and the interest of the community in being free from the menace of crime." *United States v. Burton*, 441 F.3d 509, 511-12 (7th Cir. 2006) (internal quotation omitted). The Seventh Circuit has explained that "the less protracted and intrusive a search is, the less suspicion the police need in order to be authorized by the Fourth Amendment to conduct it, and vice versa." *Id.* at 511. While categories, such as consensual encounters and investigatory stops, are used in analyzing alleged Fourth Amendment violations, the analysis is really more about determining where

on a continuum an encounter falls. *Id.* at 512. In other words, the specific circumstances of each encounter should be measured to determine the level of suspicion necessary to be reasonable.

Beginning with the argument that this was a purely consensual encounter until the arrests took place, Magistrate Judge Crocker likened the encounter between defendants and the officers to that of airport or train station encounters between narcotics officers and travelers. *See United States v. Tyler*, 512 F. 3d 405, 410 (7th Cir. 2008). To fall within the category of consensual questioning, the *Tyler* court explains a reasonable person -- facing the same circumstances as the individual being questioned -- would need to feel free to leave, as opposed to feeling obliged to stay put. *Id.* at 410-11. If the individual believes he is free to leave -- even if he refuses to answer any questions -- he has not been seized under the Fourth Amendment and the officer needs no suspicion to initiate such an encounter. *United States v. Burton*, 441 F.3d 509, 511 (7th Cir. 2006).

As the Seventh Circuit has explained,

> Even though approaching a person on the street (or at work, or on a bus) to ask him a question causes him to stop for at least the time needed to hear the question and answer (or refuse to answer), the curtailment of the bystander's mobility, privacy, and peace of mind is so slight that neither probable cause nor reasonable suspicion is required to justify the police action. No suspicion at all is required in such a case[.]

*Id.* (Internal quotation omitted.)

Bohman and Barttelt argue the stop here was not consensual. Barttelt argues that the analysis in *Tyler* simply does not apply because vehicle stops are more intrusive than stops of pedestrians. This point is well taken. *See, e.g.*, *United States v. Brewer*, 561 F.3d 676, 678

(7th Cir. 2009) ("It is unexceptional for a police officer to approach a bystander on the street and ask him whether he knows anything about some matter that the officer is investigating. . . . The issue is more complicated when the officer wants to stop a car to ask the driver or passengers something. Such a stop is a greater intrusion on freedom of movement and peace of mind . . . ."). There is, however, no hard and fast rule limiting a police officer's freedom to seek voluntary cooperation of a citizen just because the citizen is a motorist at the time of the encounter. *See*, *e.g.*, *Illinois v. Lidster*k, 540 U.S. 419, 425-27 (2004) (use of highway checkpoint to briefly stop motorists to ask for information about a recent fatal hit-and-run not presumptively invalid under Fourth Amendment). Determining whether the encounter between citizen and officer is consensual or voluntary requires a factual inquiry into the specific circumstances of the case. *United States v. Nobles*, 69 F.3d 172, 180 (7th Cir. 1995) (citation omitted).

Bohman argues that the stop was not a mere consensual questioning because the officers' car blocked his vehicle's progress so that he and Barttelt were not free to leave. In fact, not only was the officers' car brought to within ten-feet of their car, facing head-on and impeding the progress of defendants' vehicle, but it had its red and blue emergency lights on, causing defendants to stop their vehicle. These facts contrast sharply from those in *United States v. Hendricks*, 319 F.3d 993, 1001 (7th Cir. 2003), where the court found that an officer who parked his patrol car fifteen feet behind an individual's car had engaged in a consensual encounter, rather than a seizure, because the officer did not signal the car to pull over, block the car's exit or activate his emergency lights.

Certainly the manner in which Barttelt and Bohman were pulled over support the conclusion that the initial encounter was not consensual, particularly when you consider that the officers appeared out of nowhere late at night in a remote area. As Judge Crocker notes, however, other facts weigh in favor of the opposite conclusion. For example, the officers did not brandish their weapons, use a forcible tone or language, use actual physical force on defendants, or tell defendants that they were being investigated for a crime upon the initial stop. *Cf. United States v. Packer*, 15 F.3d 654, 657 (7th Cir. 1994) (officers engaged in a seizure when their vehicles were parked in front and behind defendant's car, they shined a "take down" light into defendant's windows and upon approaching the car with a flashlight, an officer asked occupants to put their hands in the air where she could see them). Instead, after defendants had stopped their car, the officers here walked up to defendants' vehicle, asked them to step out of the car and then proceeded to ask merely what they were doing in the area.

If the officers had used their emergency lights as they drove up to two men walking out of a country driveway at night and merely asked the men who they were and what they were doing, a reasonable person in similar circumstances might have felt free to leave without answering any questions. The fact that by simply placing the men in a vehicle the encounter would be elevated to a "seizure" raises a legitimate concern about whether the encounter should be considered a seizure.

Nevertheless, the court finds that a reasonable person would at least questioned if he was free to terminate the conversation with the officers and drive away under the

circumstances here.

Assuming the stop was a seizure, the question becomes whether there was a sufficient degree of confidence in the officers' suspicions to make the seizure reasonable. To justify an investigative stop, also referred to as a *Terry* stop, an officer must be aware of specific and articulable facts giving rise to a reasonable suspicion that a crime is about to be or has been committed. *United States v. Wimbush*, 337 F.3d 947, 949 (7th Cir. 2003). Whether the officers here had reasonable suspicion to stop the car is another close call. The officers certainly had more than a hunch. *Hendricks*, 319 F.3d at 1001 (mere hunch insufficient to justify a stop). At the time the officers stopped the car, their suspicions were predominately based on information obtained from Olmsted. When a single informant provides the tip that leads to the stop, the adequacy of the tip depends on the amount of information given, as well as the degree of reliability and the extent to which the officers can corroborate the information. *United States v. Booker*, 579 F.3d 835, 838 (7th Cir. 2009). In this case, Olmsted's tip was sufficiently reliable and corroborated to create a reasonable suspicion that there was or recently had been a meth lab on the property.

Olmsted provided a handful of details, several of which were corroborated. For example, he identified in a plat book the property where he had seen, on several occasions, the cooking of methamphetamines by Barttelt and, more recently, a tank of anhydrous ammonia. He said the property was owned by "Big Tony" and the property he identified was in fact owned by a Tony Thorenson. Further, he described the property as having a driveway blocked by a cable, with the driveway leading to a cabin and when Kingsley arrived

at the property he saw just such a driveway, cable and the lights of a cabin.

Then, too, Olmsted had been stopped and found with drug paraphernalia, including an anhydrous tank and hose, so he was certainly motivated to provide information that would help the police in order to reduce the charges he would face. While defendant Barttelt disagrees, there were strong disincentives to Olmsted in providing false information; wasting police time by sending them after a non-existent meth lab would only worsen Olmsted's already very tough situation. Even assuming, as Barttelt argues, Olmsted was merely rolling the dice, it was a bet made with the knowledge that in the recent past Big Tony's property was being used as a meth lab; otherwise, there would be no incentive at all to send the police to the property. In other words, Olmsted had to at least believe that there was a chance that the cabin was still being used to cook meth, because he had been arrested and was looking to help his captors. Accordingly, his tip carried an additional degree of reliability.

Finally, Lieutenant Schneck vouched for Olmsted's reliability based on past experience, the strength of which is evidenced by asking Kingsley to drive to another county to hear what Olmsted had to say. If Olmsted turned out to be lying, Schneck would be embarrassed for sending Sergeant Kingsley, with whom he worked in coordinated investigations on an ongoing basis, on a wild goose chase. For Kingsley, Schneck's past reliance on Olmsted was sufficient. Although more specifics about why Schneck found Olmsted to be a reliable informant -- such as the number of times Olmsted had previously provided information to Schneck and the results of that information -- would have provided further support for Olmsted's reliability, the absence of such specifics does not lessen

Olmsted's reliability, or at least Kingsley's reliance on Scheck's judgment.

Based on the information provided by Olmsted -- particularly that he had seen the anhydrous tank in the past week or so and had witnessed meth being cooked there before -- along with Kingsley's own experience concerning methamphetamine labs, Kingsley had specific facts to form a reasonable suspicion that there was a meth lab in the cabin.[4]

The question remains whether Kingsley's reasonable suspicion that there was a meth lab in the cabin provided him with a reasonable suspicion to stop defendants' car as it exited the drive leading to the cabin. This is a closer call. Stopping any person who is merely leaving a house where the police suspect illegal drug activity to be occurring would not alone justify a *Terry* stop and a frisk. *See, e.g.*, *United States v. Johnson*, 170 F.3d 708, 718 (7th Cir. 1999) ("Without reasonable suspicion, [police] cannot detain a person just because that individual walks out of an apartment on New Year's Eve, even if some unspecified individual (whose reliability is utterly untested) thinks something fishy is sometimes going on there.").

But the police acted on more in stopping the car containing the defendants. First, as explained already, the tip Kingsley had about the meth lab was not from some unspecified

[4] Defendant Barttelt objects to the Magistrate Judge's use of "intangibles," such as Kingsley's experience, in concluding that the investigatory stop was based on a reasonable suspicion. But the Seventh Circuit has explained that a determination of reasonable suspicion should be based on an examination of the totality of circumstances, which includes "the experience of the officer." *United States v. Fiasche*, 520 F.3d 694, 697 (7th Cir. 2008) (internal quotation omitted). Considering Kingsley's experience is, therefore, proper. Moreover, Judge Crocker did not refer to "intangibles" in deciding whether the stop of defendants while driving the Beretta was made under a reasonable suspicion. The reference was used in determining whether there was a reasonable suspicion to believe that Big Tony's property was being used to cook methamphetamine.

individual whose reliability was untested. Second, while the car leaving the property did not match the description of the car that Olmsted had said Barttelt was driving, a reasonable officer would suspect that any car leaving the property might contain the person Olmsted had identified as cooking meth at the cabin. It being night, it was impossible to tell who was in the car without stopping it, and even if the officers could see into the car without stopping it, they had only been given a name, not a description.

Third, the officers had seen some suspicious behavior when a car immediately drove to the cable after Kingsley's inadvertent horn honk, and then quickly returned to the cabin only to come back down the drive and exit the property several minutes later. A reasonable officer would find that the car's actions raised further suspicion that someone at the cabin had been a lookout stationed to prevent intrusion on the meth lab likely located in the cabin.

Finally, unlike the *Johnson* decision, no arrest or pat down of the defendants occurred until after the officers clearly had reasonable suspicion supported by articulable facts, including the smell of anhydrous ammonia, Olmsted's corroborated tip and knowledge of Bohman's previous involvement with a meth lab. The totality of these circumstances provided the officers some minimal level of suspicion.

The Seventh Circuit advises that officers' "seizure" of a car based on less than reasonable suspicion may still be lawful provided the level of suspicion was enough to justify the level of intrusion created by the seizure. *See Burton*, 441 F.3d at 512 (quoting *United*

*States v. Chaidez*, 991 F.2d 1193, 1197-98 (7th Cir. 1990)).[5] In *Burton*, 441 F.3d at 510, three police officers on bicycles were watching a house which an informant had identified as a drug house. A car stopped in the street near the alleged drug house and a man, Johnson, exited an adjacent house, ran to the car and leaned in the driver window, all while the car was still running. *Id.* The officers approached the car on their bikes, with one officer positioning himself in front of the car and the other two officers stationing themselves on opposite sides of the car. *Id.* The officers questioned Johnson, as well as the driver, about what was happening. *Id.* Based on some shaky answers and suspicious actions, the officers then patted down both men discovering a knife on Johnson and a gun on the driver, who was later charged for being a felon in possession of a gun. *Id.* at 510-11. The driver sought to have the evidence of his possession of the gun suppressed, contending that the gun had been obtained after an unjustified seizure in violation of his Fourth Amendment rights. *Id.* at 510.

The Seventh Circuit determined that the officers had indeed "seized" the car by surrounding it on their bikes. *Id.* at 511. The appellate court further noted that the seizure or stop was done "on the basis merely of the drug-house tip, Johnson's emergence from the

[5] While all three circuit court judges on the panel deciding *Burton* held that the officers' temporary seizure of the car did not violate the driver's Fourth Amendment rights, Judge Rovner wrote a separate concurrence because she disagreed with the majority's discussion of minimal stop and minimal suspicion. 441 F.3d at 513. Specifically, Judge Rovner explained that in affirming the district court's finding of no Fourth Amendment violation based on the fact that the man standing in the street had violated Wisconsin law by impeding traffic, she "would say no more about whether seizures that are unsupported by either probable cause or reasonable suspicion may nonetheless be sustained as reasonable based on their brevity and minimal degree of intrusiveness." *Id.*

adjacent house, and the position he assumed in the street." *Id.* at 512. While such information would not have been sufficient suspicion to support ordering the driver out of his car so that he could be frisked, the court held that this was of "[n]o matter" because such "mounting suspicion of illegal activity" was sufficient to satisfy the Fourth Amendment's reasonableness requirement. *Id.* More specifically, the court held: "That was a minimal stop, requiring only minimal suspicion; and that the police had." *Id.* at 513.

Whether the officers' initial stop of defendants' car here was supported by a reasonable suspicion that the occupants had committed a crime is a debatable point. The initial stop to ask questions of the occupants, which involved a minimal intrusion, was at least supported by minimal suspicion. In other words, all the reasons given for why the officers' suspicion about a car coming down the private drive from a cabin in which a meth lab is likely operating at least moves the stop of the car beyond a hunch to at least minimal suspicion. The stop would obviously be more suspect had it occurred as soon as the officers arrived at the property, before they were able to corroborate the remainder of the information given by Olmsted and before witnessing the sudden, suspicious actions of a car coming from and returning to the cabin under surveillance. Those circumstances would more closely resemble an unconstitutional stop and pat down where someone was merely leaving a suspected drug house. *See, e.g.*, *Johnson*, 170 F.3d at 711 (officers had a second hand tip that drug activity was being conducted in an apartment and upon approaching the apartment to conduct a "knock and talk" an individual exited the apartment and the officers stopped and frisked the individual for no other reason than his leaving the apartment).

Even assuming that the officers' actions in stopping the car did constitute an unreasonable search and seizure under the Fourth Amendment, that conclusion does not necessarily require suppression of evidence obtained after the search or seizure. *Herring v. United States*, ___ U.S. ___, 129 S. Ct. 695, 702 (2009). As the Supreme Court explained, "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 702.

In the end, the closeness of the determinations about whether the encounter was consensual or a seizure, and even more whether the officers had a reasonable suspicion for a stop, compels the conclusion that any error in judgment by officers Kingsley and VanderWyst in stopping the vehicle under these circumstances amounted to no more than negligence, having been made in a good faith attempt to pursue their investigation in a lawful matter. *See id.*("An error that arises from nonrecurring and attenuated negligence is thus far removed from the core concerns that led us to adopt the [exclusionary] rule in the first place.").

This is not, therefore, the type of flagrant conduct that triggers the exclusionary rule. *See, e.g.*, *Mapp v. Ohio*, 367 U.S. 643, 644-45 (1961) (exclusion of evidence warranted when officers forced open door, prevented individual's lawyer from entering, brandished a false warrant, put the individual in hand-cuffs and searched the house). Accordingly, the court will adopt the Magistrate Judge's report and recommendation as modified herein and deny Barttelt's and Bohman's motions to suppress evidence derived from the August 18, 2009

stop.

ORDER

IT IS ORDERED that:

(1) The Magistrate Judge's recommendation is ADOPTED as modified herein.

(2) The motions to suppress evidence of Daniel L. Bohman and Jake Barttelt are DENIED.

(3) The court consents to defendants ability to appeal this order in accordance with the July 23, 2010 plea agreement.

Entered this 23rd day of August, 2010.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge